Mr. Justice Goldberg,
with whom Mr. Justice Stewart and Mr. Justice White join,
dissenting.
The issue presented is whether the Commerce Clause permits a State to assess an unapportioned gross receipts tax on the interstate wholesale sales of automobiles delivered to dealers for resale in that State. In upholding the tax involved in this case, the Court states as a general proposition that “taxation measured by gross receipts [from interstate sales] is constitutionally proper if it is fairly apportioned.” Ante, at 440. The Court concludes from this that the validity of Washington’s wholesale sales tax may be determined by asking “ 'the simple but controlling question [of] whether the state has given anything for which it can ask return.’ ” Ante, at 441. This elusively simple test and its application to this case repre *584 sent an important departure from a fundamental purpose of the Commerce Clause and from an established principle which had heretofore provided guidance in an area otherwise fraught with complexities and inconsistencies.
The relevant facts, which are undisputed, merit brief restatement. General Motors manufactures in California, Missouri and Michigan motor vehicles, parts and accessories which are sold at wholesale to independent dealers. The corporation manufactures none of these products within the State of Washington but does sell them to local Washington retail dealers. General Motors conducts business through “Divisions” which although not separately incorporated are operated as substantially independent entities. This case involves wholesale sales by the Chevrolet, Pontiac, Oldsmobile and General Motors Parts Divisions to independent dealers in Washington. As a general matter the sales and orders involved in this case were handled and approved by zone offices in Portland, Oregon. General Motors has a limited number of sales representatives (“district managers”) who reside in Washington and who maintain contacts with the local dealers in order to facilitate the sales of General Motors products, but these sales representatives conducted no business in Washington other than the promotion of their wholesale interstate sales. The orders for automobiles were sent directly to the Portland zone offices where they were accepted’ for shipment, f. o. b., from points outside of Washington. For the purposes of this case, however, it is useful to divide the transactions — the taxability of which is in dispute — into three categories:
(1) Pontiac and Oldsmobile Divisions Sales: These Divisions had no office, establishment or intrastate business in Washington; they operated entirely through Portland zone offices and the Washington sales representatives.
*585 (2) General Motors Parts Division Sales: This Division maintained warehouses in both Seattle, Washington, and Portland, Oregon. The Seattle warehouse sold directly to local Washington dealers and the tax imposed on such sales has been paid and is not disputed here; The sales to Washington dealers of parts and accessories ordered from and delivered by the Portland warehouse were, however, also taxed and those taxes are disputed here.
(3) Chevrolet Division Sales — “Class A and B” Sales: The Chevrolet Division maintained a one-man branch office in Seattle, Washington; and all sales within the territorial jurisdiction of that office have been referred to in this litigation as “Class A” transactions. This one-man office operated under the direction of the Portland zone office and conducted no business in the State of Washington other than to facilitate the management and handling of sales and orders through the Portland zone office. The Seattle office, however, dealt only with Washington's northern counties and did not deal with nine of Washington’s southern counties; the sales to dealers in those southern counties have been labeled “Class B” sales and had no connection with Chevrolet’s Seattle office. The “Class B” sales were therefore similar to those in category (1) above.
All of the above transactions have been subjected to an unapportioned gross receipts tax which the State of Washington assesses for the privilege of “engaging within this state in the business of making sales at wholesale.” Rev. Code Wash. 82.04.270; Wash. Laws 1949, c. 228, § 1 (e).[1]
*586 On these facts the Court holds that the activities of the sales representatives constitute “an in-state activity” forming “a sufficient local incident upon which a tax may be based.” Ante, at 447. This decision departs from Norton Co. v. Department of Revenue, 340 U. S. 534, and adopts a test there rejected. Norton involved a Massachusetts corporation which operated “a branch office and warehouse” in Chicago, Illinois, from which it made “local sales at retail.” Id,., at 535. The Massachusetts corporation was admittedly engaging in intrastate business within Illinois and was making local sales concededly subject to taxation by the State. In addition to “over-the-counter” Chicago sales, the Massachusetts firm made two other types of sales to Illinois inhabitants: (1) Sales based on orders or shipments which at some point were routed through or utilized the Chicago outlet and (2) sales based on orders from Illinois inhabitants sent directly to Massachusetts and filled by direct shipment to the purchasers. The Illinois tax was imposed upon all receipts obtained by Norton from sales to Illinois residents regardless of whether those sales were associated or connected with the local office and warehouse which was conducting intrastate business. The Court stated that when, “as here, the corporation has gone into the State to do local business,” the firm could be exempted from taxation on sales “only by” sustaining the burden of “showing that the particular transactions are dissociated from the local business and interstate in nature.” Id., at 537. The Court held in part that “the judgment attributing to the Chicago branch income from all sales that utilized it either in receiving the orders or distributing the goods was within the realm of permissible judgment.” Id., at 538. (Emphasis added.) But in spite of the burden of persuasion resting on a firm having an office doing intrastate business, the Court concluded that the tax on all sales by Norton to Illinois customers was *587 not wholly within “the realm of permissible judgment.” The Court held that those sales involving goods and orders which proceeded directly from Massachusetts to the Illinois customers without becoming associated with thé Chicago outlet were so clearly “interstate in character” that they could not be subjected to the Illinois tax. Id., at 539. In so holding the Court stated that the out-of-state corporation “could have approached the Illinois market through solicitors only and it would have been entitled to the immunity of interstate commerce . . . .” Id., at 538.
The facts and holdings of Norton should be compared with the facts and decision of the Court in the present case. The Norton decision surely requires immunity for the sales in category (1) (Pontiac and Oldsmobile Divisions Sales) for those sales were not only interstate in character but were wholly free from association with any local office or warehouse conducting intrastate business.
With respect to the transactions in category (2) (General Motors Parts Division Sales), it appears that the offices and warehouses operated by the Parts Division in Seattle, Washington, and in Portland, Oregon, create a situation strikingly similar to that in Norton where the Massachusetts firm maintained an outlet in Chicago, Illinois. Here as in Norton the Court is presented with an identifiable group of sales transactions (those involving sales at the local Seattle warehouse) which appear to have been over-the-counter and intrastate in character and with a readily distinguishable group of sales transactions (those involving only the Portland warehouse) which were not connected with an intrastate business and which were interstate in character. In Norton the latter type of purely interstate sales, those unconnected with any intrastate business, were squarely held nontaxable.
Finally, with respect to transactions in category (3) (Chevrolet Division Sales — “Class A and B” Sales), *588 those in “Class B,” which by definition lacked any connection with an in-state office, would seem to be precisely like those in Norton which had no connection with an in-state establishment and which accordingly were exempted. And, as to the “Class A” sales which were connected with the one-man Seattle office, it is important to note that this in-state “office,” unlike the “office and warehouse” involved in Norton, made no intrastate or retail sales, stocked no products and had no authority to accept sales orders. In fact the Seattle “office” simply operated to facilitate the interstate sales directed by the zone office in Portland, Oregon.
Although the opinion of the Court seems to imply that there still is some threshold requirement of in-state activity which must be found to exist before a “fairly apportioned” tax may be imposed on interstate sales, it is difficult to conceive of a state gross receipts tax on interstate commerce which could not be sustained under the rationale adopted today. Every interstate sale invariably involves some local incidents — some “in-state” activity. It is difficult, for example, to distinguish between the in-state activities of the representatives here involved and the in-state activities of solicitors or traveling salesmen-— activities which this Court has held are insufficient to constitute a basis for imposing a tax on interstate sales. McLeod v. J. E. Dilworth Co., 322 U. S. 327; cf. Real Silk Hosiery Mills v. City of Portland, 268 U. S. 325; Robbins v. Shelby County Taxing District, 120 U. S. 489. Surely the distinction cannot rest on the fact that the solicitors or salesmen make hotels or motels their “offices” whereas in the present case, the sales representatives made their homes their “offices.” In this regard, the Norton decision rested solidly on the fact that the taxpayer had a branch office and warehouse making intrastate retail sales.
The opinion of the Court goes beyond a consideration of whether there has been in-state activity of appropriate *589 character to satisfy a threshold requirement for imposing a tax on interstate sales. The Court asserts as a general principle that the validity of a tax on interstate commerce “rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation.” Ante, at 440. What is “fair” ? How are we to determine whether a State has exerted its power in “proper proportion to appellant’s activities within the State”? Ante, at 441. See Note, Developments — Federal Limitations on State Taxation of Interstate Business, 75 Harv. L. Rev. 953, 957 (1962). I submit, with due respect for the complexity of the problem, that the formulation suggested by the Court is unworkable. Constitutional adjudication under the Commerce Clause would find little guidance in a concept of state interstate sales taxation tested and limited by the tax’s “fair” proportion or degree. The attempt to determine the “fairness” of an interstate sales tax of a given percentage imposed on given activities in one State would be almost as unseemly as an attempt to determine whether that same tax was “fairly” apportioned in light of taxes levied on the same transaction by other States. The infinite variety of factual configurations would readily frustrate the usual process of clarification through judicial inclusion and exclusion. The only coherent pattern that could develop would, in reality, ultimately be based on a wholly permissive attitude toward state taxation of interstate commerce.
The dilemma inhering in the Court’s formulation is revealed by its treatment of the “more difficult,” but inextricably related, question arising from the alleged multiple taxation. The Court would avoid the basic question by saying that appellant “has not demonstrated what definite burden, in a constitutional sense, the St. Louis tax places on the identical interstate shipments . . . . And further, it has not been shown that Oregon levies *590 any tax on appellant’s activity bearing on Washington sales.” [2] Ante, at 449. These problems are engendered by the rule applied here and cannot be evaded. For if it is “fair” to subject the interstate sales to the Washington wholesale sales tax because of the activities of the sales representatives in Washington, then it would seem equally “fair” for Oregon, which is the site of the office directing and consummating these sales, to tax the same gross sales receipts. Moreover, it would seem “fairer” for California, Michigan or Missouri — States in which automobiles are manufactured, assembled or delivered — to impose a tax measured by, and effectively bearing upon, the same gross sales receipts. See Note, 38 Wash. L. Rev. 277, 281 (1963). Presumably, if there is to be a limitation on the taxing power of each of these States, that limitation surely cannot be on a first-come-first-tax basis. Alternatively, if diverse local incidents can afford bases for multi-state taxation of the same interstate sale, then the Court is left to determine, out of some hypothetical maximum taxable amount, which proportion is “fair” for each of *591 the States having a sufficient “in-state” contact with the interstate transaction.
The burden on interstate commerce and the dangers of multiple taxation are made apparent by considering Washington’s tax provisions. The Washington provision here involved — the “tax on wholesalers” — provides that every person “engaging within this state in the business of making sales at wholesale” shall pay a tax on such business “equal to the gross proceeds of sales of such business multiplied by the rate of one-quarter of one per cent.” Rev. Code Wash. 82.04.270; Wash. Laws 1949, c. 228, § 1 (e).[3] In the same chapter Washington imposes a “tax on manufacturers” which similarly provides that every person “engaging within this state in business as a manufacturer” shall pay a tax on such business “equal to the value of the products . . . manufactured, multiplied by the rate of one-quarter of one per cent.” Rev. Code Wash. 82.04.240; Wash. Laws 1949, c. 228, § 1 (b). Then in a provision entitled “Persons taxable on multiple activities” the statute endeavors to insure that local Washington products will not be subjected both to the “tax on manufacturers” and to the “tax on wholesalers.” Rev. Code Wash. 82.04.440; Wash. Laws 1949, c. 228, § 2-A. Prior to its amendment in 1950 the exemptive terms of this “multiple activities” provision were designed so that a Washington manufacturer-wholesaler would pay the manufacturing tax and be exempt from the wholesale tax. This provision, on its face, discriminated against interstate wholesale sales to Washington purchasers for it exempted the intrastate sales of locally made products while taxing the competing sales of interstate sellers. In 1950, however, the “multiple activities” provision was amended, reversing the tax and the exemption, so that a Washington manufacturer-wholesaler would first be sub *592 jected to the wholesale tax and then, to the extent that he is taxed thereunder, exempted from the manufacturing tax. Rev. Code Wash. 82.04.440; Wash. Laws 1950 (special session), c. 5, § 2. See McDonnell & McDonnell v. State, 62 Wash. 2d 553, 557, 383 P. 2d 905, 908. This amended provision would seem to have essentially the same economic effect on interstate sales but has the advantage of appearing nondiscriminatory.
Even under the amended “multiple activities” exemption, however, an out-of-state firm manufacturing goods in a State having the same taxation provisions as does Washington would be subjected to two taxes on interstate sales to Washington customers. The firm would pay the producing State a local manufacturing tax measured by sales receipts and would also pay Washington a tax on wholesale sales to Washington residents. Under such taxation programs, if an out-of-state manufacturer competes with a Washington manufacturer, the out-of-state manufacturer may be seriously disadvantaged by the duplicative taxation. Even if the out-of-state firm has no Washington competitors, the imposition of interstate sales taxes, which add to the cost of producing, may diminish the demand for the product in Washington and thus affect the allocation of resources in the national economy. Moreover, the threat of duplicative taxation, even where there is no competitor manufacturing in the consuming State, may compel the out-of-state producer to relocate his manufacturing operations to avoid multiple taxation. Thus taxes such as the one upheld today may discourage the development of multistate business operations and the most advantageous distribution of our national resources; the economic effect inhibits the realization of a free and open economy unencumbered by local tariffs and protective devices. As the Court said in McLeod v. J. E. Dilworth Co., 322 U. S., at 330-331: “The very purpose of the Commerce Clause was to create an area of free *593 trade among the several States. That clause vested the power of taxing a transaction forming an unbroken process of interstate commerce in the Congress, not in the States.”
It may be urged that the Washington tax should be upheld because it taxes in a nondiscriminatory fashion all wholesale sales, intrastate and interstate, to Washington purchasers. The Commerce Clause, however, was designed, as Mr. Justice Jackson said in H. P. Hood & Sons, Inc., v. Du Mond, 336 U. S. 525, 538, to create a “federal free trade unit” — a common national market among the States; and the Constitution thereby precludes a State from defending a tax on interstate sales on the ground that the State taxes intrastate sales generally. Nondiscrimination alone is no basis for burdening the flow of interstate commerce. The Commerce Clause “does not merely forbid a State to single out interstate commerce for hostile action. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States. It is immaterial that local commerce is subjected to a similar encumbrance.” Freeman v. Hewit, 329 U. S., at 252. A State therefore should not be enabled to put out-of-state producers and merchants at a disadvantage by imposing a tax to “equalize” their costs with those of local businessmen who would- otherwise suffer a competitive disadvantage because of the State’s own taxation scheme. The disadvantage stemming from the wholesale sales tax was created by the State itself and therefore the fact that the State simultaneously imposes the same tax on interstate and intrastate transactions should not obscure the fact that interstate commerce is being burdened in order to protect the local market.[4]
*594 In my view the rules set forth in Norton Co. v. Department of Revenue, supra, reflect an attempt to adhere to the basic purposes of the Commerce Clause. Therefore, in dealing with unapportioned taxes on interstate sales, I would adhere to the Norton rules instead of departing from them by adopting a standard of “fairness.” I would hold that a manufacturer or wholesaler making interstate sales is not subject to a state gross receipts tax merely because those sales were solicited or processed by agents living or traveling in the taxing State. As Norton recognized, a different rule may be applied to the taxation of sales substantially connected with an office or warehouse making intrastate sales. The test adopted by the Court today, if followed logically in future cases, would seem to mean that States will be permitted to tax wholly interstate sales by any company selling through local agents or traveling salesmen. Such a rule may leave only mail-order houses free from state taxes on interstate sales. With full sympathy for the revenue needs of States, I believe there are other legitimate means of raising state revenues without undermining the common national market created by the Commerce Clause. I therefore respectfully dissent.

 The tax periods involved in this case are from January 1, 1949, through June 30, 1953.

 With respect to the view that the application of the Commerce Clause depends upon the existence of actual, as distinguished from potential, multiple taxation, compare Freeman v. Hewit, 329 U. S. 249, 256: “It is suggested . . . that the validity of a gross sales tax should depend on whether another State has also sought to impose its burden on the transactions. If another State has taxed the same interstate transaction, the burdensome consequences to interstate trade are undeniable. But that, for the time being, only one State has taxed is irrelevant to the kind of freedom of trade which the Commerce Clause generated. The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment. Courts are not possessed of instruments of determination so delicate as to enable them to weigh the various factors in a complicated economic setting which, as to an isolated application of a State tax, might mitigate the obvious burden generally created by a direct tax on commerce.”

 See note 1, supra.

 Cf. Baldwin v. G. A. F. Seelig, Inc., 294 U. S. 511, 523: “To give entrance to that excuse [“the economic welfare of the farmers or of any other class or classes” of local businessmen] would be to invite *594 a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.” See H. P. Hood & Sons, Inc., v. Du Mond, 336 U. S. 525, 532-539.